**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF INDIANA**
**FORT WAYNE DIVISION**

UNITED STATES OF AMERICA,

      Plaintiff,

           v.                   CASE NO. 1:25-CR-15-HAB-ALT

BENNY C. SWIFT,

      Defendant.

## OPINION AND ORDER

Before the Court is Defendant Benny Swift's Motion to Suppress (ECF No. 56) seeking to suppress all evidence recovered pursuant to a January 31, 2025 federal search warrant and the subsequent search warrants stemming from that first warrant. Swift challenges the probable cause for issuance of the search warrant and whether officers exceeded its scope when executing the warrant. As part of his probable cause challenge, he also contends the DEA Task Force Officer swearing the search warrant affidavit omitted material facts which, in turn, mislead the magistrate judge. Thus, he requests a hearing under *Franks v. Delaware*, 438 U.S. 154 (1978) (ECF No. 57 at 20).[1] The Government responded in opposition on December 22, 2025 (ECF No. 59), to which Swift replied on January 16, 2026 (ECF No. 63). Because the Court determines that a Franks hearing is not warranted and neither the issuance nor the execution of the search warrant run afoul of the Fourth Amendment, the Motion to Suppress and request for *Franks* hearing are DENIED.

---

[1] In his Brief in Support of his Motion to Suppress Evidence, Swift did not specify his request for a hearing under *Franks* but instead generally requested "an evidentiary hearing to assess the representations and omissions of the January Warrant Affidavit and upon which the subsequent searches and seizures in this case were based." (ECF No. 57 at 20). Following the Government's Response, Swift clarified that he was, in fact, seeking a *Franks* hearing. (ECF No. 63 at 16).

## SEARCH WARRANT AFFIDAVIT

On February 10, 2025, officers served a federal search warrant at Swift's business and residence located at 2322 South Calhoun Street in Fort Wayne, Indiana. The search yielded large quantities of fentanyl powder, two bags of blue fentanyl pills, a loaded handgun, a loaded rifle, and other drug evidence. The officers also located papers addressed to Swift's business—Vision Baby, LLC at 2322 South Calhoun—and a new residence in Swift's name at 11701 Stour Cove, Fort Wayne, Indiana.

The above search resulted from a search warrant application submitted on January 31, 2025, by DEA Task Force Officer Peter Mooney ("TFO Mooney"), a veteran member of the Fort Wayne Police Department ("FWPD"). The twenty-two-page affidavit (ECF No. 59-2) from TFO Mooney summarizes an ongoing investigation into alleged drug activity involving Swift, mostly stemming from multiple controlled buys conducted using a confidential source ("CS") to purchase narcotics from Swift in March and April 2024. The affidavit begins with a recitation of TFO Mooney's training and expertise in investigating narcotics sales and distribution. Through his twenty years of experience as a FWPD officer—including thirteen years as a DEA TFO—TFO Mooney averred that he has extensive knowledge of and familiarity with the methods of illegal drug traffickers, such as (1) their methods of importing and distributing controlled substances; (2) the use of telecommunication devices and counter surveillance techniques; and (3) the use of coded or cryptic language, words, and references to conduct drug transactions.

Specific to this investigation, TFO Mooney averred that law enforcement officers, using the CS, conducted three controlled buys of narcotics in March and April 2024. TFO Mooney first described the pre- and post-buy procedures for conducting a controlled buy with a CS, which included routine processes such as thoroughly searching the CS and the CS's vehicle both before

and after the transaction to ensure there is no illegal contraband, substances, or currency brought by the CS; issuing pre-recorded U.S. currency as buy money; fitting the CS with a listening and recording device; and maintaining surveillance over the CS throughout the pre-search, transaction, and post-search processes. TFO Mooney also represented that the CS gave verifiable information about Swift which led TFO Mooney to believe the CS was credible and reliable. Specifically, the CS provided a physical description of Swift as well as identified Swift's business name, business address, and the vehicle Swift drove, all of which were independently verified by FWPD Detective Wise. Additionally, during the controlled buys officers were able to listen to and observe the CS and Swift during the controlled buys and further observe Swift driving the identified vehicle, lending to the CS's credibility and reliability.

The first controlled buy was conducted on March 28, 2024. The CS, who had previously communicated with Swift through the phone, arranged to buy 100 grams of fentanyl from "Benny," who also went by "Swift," at a clothing store called "Baby Vision"[2] located at 2322 South Calhoun Street ("Vision Baby" or "South Calhoun Location:"). Set up with a wire and $4,500 of pre-recorded buy money, the CS texted they were on the way to the store and parked on the south side of the premises. At the same time, surveillance officers positioned at Swift's residence on West Woodland Avenue—located through the FWPD database and confirmed after an officer saw a vehicle in the driveway which was registered to Benny Swift at that address—observed Swift exit the residence, get into a maroon truck, and drive to the South Calhoun meetup. Swift and the CS then entered the store together and walked to a back room where the CS exchanged the cash for 100 grams of fentanyl. Det. Wise later field-tested the drugs, which came

---

[2] Though TFO Mooney's affidavit refers to the clothing store as "Baby Vision", the store is named "Vision Baby".

back with a positive result for fentanyl and a weight of 99.9 grams. These events were confirmed by the wire recording and independent observation by the officers.

On April 10, 2025, the same CS arranged to make a second purchase of fentanyl from Swift, also at the South Calhoun location and using the same standard protocols for a controlled buy, including using a recording device on the CS. The CS and Swift entered the building, but though the CS provided Swift with $4,500, Swift told the CS he "was not doing anything right now" and would later bring the fentanyl to the CS. (ECF No. 59-2 at 14). The CS then purchased an item from the business and Swift handed the CS $20 of the recorded cash. According to TFO Mooney, the CS handed him the $20 of pre-recorded money and then relayed that Swift "moved his narcotics to another location because of something that happened." (*Id.*).

In the following days, the CS tried several times to meet up with Swift to complete the transaction, but Swift apparently "was still too nervous to conduct narcotics transactions" yet nevertheless held on to the $4,480. (*Id.*).

On April 16, 2024, the CS informed Det. Wise that Swift was ready to complete the buy, so the CS underwent the same controlled-buy procedures as used previously. The CS drove to Vision Baby, but found the front door locked. Swift told the CS he would be there shortly. When he arrived, Swift unlocked the front door and went inside the store with the CS. Swift then handed the suspected fentanyl to the CS, and the two parted ways. A short while later, the CS met up with Det. Wise, who field tested the drugs which once again tested positive for fentanyl with a weight of 90.9 grams.

Inexplicably, seven months then passed.[3] On November 21, 2024, officers conducted visual surveillance of Swift at the South Calhoun location. They reported observing Swift exit

---

[3] The affidavit includes no explanation for this passage of time.

Vision Baby, get into the same maroon truck he had previously been seen driving, and then leaving. A short while later he returned to the store, unlocked the front door, and walked back inside. Less than ten minutes after his return, the CS informed agents that Swift had reached out to say he "had a lot of 'perk-30,' fentanyl pills." (*Id.* at 16).

Two more months passed. On January 8, 2025, the CS was arrested by the FWPD for possession of marijuana and for a failure to appear for a traffic violation. Five days later, on January 13, TFO Mooney reached out again to the CS to see if there had been any contact with Swift. The CS told Mooney that they had stopped by Vision Baby to see if Swift had any narcotics, Swift was not there. Two days later, on January 15, the CS informed TFO Mooney that one of their cousins had got "some stuff" (meaning narcotics) from Swift at the South Calhoun location a few days prior. Apparently the CS's cousin was planning to return the narcotics to Swift, claiming they were of poor quality. The CS also told Mooney that Swift would probably not meet with the CS again because they owed Swift money. On January 16, however, the CS reached out to Swift again, who texted the CS "'Old thang back,' referring to narcotics." (*Id.* at 17). To further clarify, the CS messaged Swift back to say they were "going to let people know Swift had more narcotics on hand." (*Id.*).

Based on the above information, TFO Mooney asserted that in his training and experience in the practices of drug traffickers he believed evidence of drug trafficking would be found at the South Calhoun address and in any digital device found on the premises. The federal Magistrate Judge agreed, determined that probable cause existed, and issued a warrant which described the premises as having

> [A] black and white in color business front and a light-colored side on the south side of the structure. The front door of the business is dark in color with a red trim and a small window, which is covered. Two windows on either side of the service door are positioned in the white portion of the front side of the business with red

trim. The business is located on the west side of Calhoun. The residence is believed
to be controlled by Benny Swift. The request to search includes all structures and
vehicles located on this property or within the residence's curtilage.

(Search Warrant, ECF No. 59-2 at 2). The warrant authorized the seizure of all controlled
substances, drug paraphernalia, ledgers and papers with identifying information, electronic
devices, cash, firearms and other dangerous weapons, among other items. (*Id.*).

As noted at the outset, officers executed the search warrant and located significant evidence
of drug trafficking as well as multiple firearms. The search of the downstairs business uncovered
one firearm; all other evidence, including all the drug trafficking evidence, was found in an upstairs
apartment which is accessed from the interior of the business. Based on the controlled buys and
the recovered evidence from the South Calhoun location, officers sought and received an
additional warrant to search Swift's Stour Cove residence, as well as DNA and Cell Phone search
warrants. Swift has moved to suppress all evidence seized because of the four warrants.

## LEGAL ANALYSIS

### I.    January Search Warrant Issuance

Swift challenges the issuance and execution of the January search warrant on multiple
grounds. First, he argues that the warrant was issued without probable cause. Specifically, he
claims the warrant affidavit was based on stale, unrefreshed, and otherwise unreliable information
and uncorroborated hearsay, the combination of which was insufficient to support a finding of
probable cause. Second, he asserts that the affidavit omitted material information that would have
been relevant to the magistrate judge's probable cause determination. Third, Swift challenges the
scope of the warrant, contending it was too broad and failed to describe with particularity the area
to be searched because the South Calhoun location included both a business and an upstairs
residence, which Swift describes as a separate unit. Fourth, Swift anticipates the Government's

6

defense and argues the good-faith exception should not apply because the seasoned officers should have known the stale information for the controlled buys would be insufficient to establish probable cause, and the remaining information in the warrant application "was so facially deficient as to render the search warrant invalid." (ECF No. 57 at 20). And finally, Swift challenges the execution of the warrant in that he contends that the officers serving the warrant exceeded its scope when they entered the upstairs apartment, where the relevant evidence was seized.

### a. *Probable Cause*

Swift makes two arguments to convince the Court that the magistrate judge erred in finding probable cause. First, he asserts that the only credible information supporting probable cause—the controlled buys in March and April 2024—was stale by January 2025, and that no new *reliable* information in the subsequent months properly refreshed that information. Second, given that the controlled buy information was stale and should be excluded, there was insufficient credible information remaining to support a finding of probable cause because the information gathered in January 2025 was unreliable, lacked proper corroboration, and improperly relied on hearsay. The Government opposes the motion, asserting that the Magistrate Judge properly concluded that probable cause existed to believe evidence of drug trafficking activity would be found at the South Calhoun location given that there were multiple controlled buys using a CS and that the totality of circumstances indicated a continuing drug trafficking operation at that address.

The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. It requires searches to be conducted pursuant to a warrant, issued upon probable cause that a crime occurred. *Id.* The "central teaching" of the Supreme Court's "decisions bearing on the probable cause standard is that it is a 'practical, nontechnical conception.'" *Illinois v. Gates*, 462 U.S. 213,

231 (1983) (quoting *Brinegar v. United States*, 338 U.S. 170, 176 (1949)). These "probabilities" are non-technical; "they are the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act." *Id.* (quoting *Brinegar*, 338 U.S. at 175).

This Court defers to the warrant-issuing judge's determination of probable cause if there is substantial evidence in the record to support the decision. *United States v. Koerth,* 312 F.3d 862, 865 (7th Cir. 2002). When an affidavit is the only evidence presented to a judge to support a search warrant, as it is here, the validity of the warrant hinges on the strength of the affidavit. *United States v. Orozco*, 576 F.3d 745, 748 (7th Cir. 2009). A search warrant affidavit establishes probable cause when, based on the totality of circumstances, it "sets forth sufficient evidence to induce a reasonably prudent person to believe that a search will uncover evidence of a crime." *United States v. Mykytiuk*, 402 F.3d 773, 776 (7th Cir. 2005) (citing *United States v. Peck*, 317 F.3d 754, 755–56 (7th Cir. 2003), and *Gates*, 462 U.S. at 238). "The task of the issuing magistrate is simply to make a practical, commonsense decision whether, given all the circumstances set forth in the affidavit before him, there is a fair probability that contraband or evidence of a crime will be found in a particular place." *United States v. Sims*, 551 F.3d 640, 644 (7th Cir. 2008) (ellipsis and brackets omitted).

When the facts submitted in the affidavit stem from a confidential informant, the legitimacy of a probable cause determination turns on the informant's reliability, veracity, and basis of knowledge. *United States v. Olson,* 408 F.3d 366, 370 (7th Cir. 2005). To assess credibility, the Court considers whether the informant: (1) had firsthand knowledge; (2) provided sufficient details; (3) relayed information which was subsequently corroborated; and (4) testified at a probable cause hearing. *Id.*

Here, although the CS did not testify at a probable cause hearing, the remaining factors certainly support the Magistrate Judge's conclusions relating to probable cause and the issuance of the warrant for the South Calhoun location. *See United States v. Brack*, 188 F.3d 748, 756 (7th Cir. 1999) ("[A] deficiency in one factor may be compensated for by a strong showing in another or by some other indication of reliability."). The Government in this case has made a strong showing demonstrating the reliability of the CS's information. Not only was the information provided by the CS about Swift's physical appearance, Swift's business, and the vehicle Swift drives—all of which was independently corroborated by the officers—there was also physical surveillance, audio surveillance, and most importantly multiple controlled buys. Swift quibbles as to whether there were two or three controlled buys, given that money only exchanged hands twice; but that is simply a matter of semantics. In any case, there were three controlled drug trafficking *interactions* between the CS and Swift, wherein the procedures used by law enforcement provided independent and contemporaneous corroboration of the CS's reliability. *See United States v. Romero*, No. 1:22-CR-40, 2022 WL 17986198, at *5 (N.D. Ind. Dec. 29, 2022); *United States v. Orr*, 969 F.3d 732, 737 (7th Cir. 2020) ("Generally, a controlled buy, when executed properly, is a reliable indicator as to the presence of illegal drug activity.") (quoting *United States v. Sidwell*, 440 F.3d 865, 869 (7th Cir. 2006)); *United States v. McKinney*, 143 F.3d 325 (7th Cir. 1998) ("[C]ontrolled buys add great weight to an informant's tip.").

Despite the CS's demonstrated reliability, however, the Court must nevertheless contend with whether the information procured in the controlled buys was "stale" or later refreshed. "Staleness is highly relevant to the legality of a search for a perishable or consumable object" such as guns or drugs. *United States v. Seiver*, 692 F.3d 774, 777 (7th Cir. 2012). However, "depending on the circumstances, evidence of the sighting of a gun (or related items) does not automatically

grow stale as time passes." *United States v. Hicks*, 650 F.3d 1058, 1068 (7th Cir. 2011) (collecting cases). "And more recent information supporting probable cause can freshen information that might otherwise be stale." *United States v. Bradford*, 905 F.3d 497, 504 (7th Cir. 2018) (citing *United States v. Prideaux-Wentz*, 543 F.3d 954, 958 (7th Cir. 2008); *United States v. Newsom*, 402 F.3d 780, 783 (7th Cir. 2005)). "Accordingly, if a complaint indicates 'ongoing, continuous criminal activity, the passage of time becomes less critical.'" *Edmond v. United States*, 899 F.3d 446, 454 (7th Cir. 2018) (quoting *United States v. Shomo*, 786 F.2d 981, 984 (10th Cir. 1986)).

As to staleness, Swift attempts to distinguish the facts here from those in *Bradford*, in which six weeks passed between the most recent controlled buy and the warrant being issued. 905 F.3d at 504. Though Bradford argued that lapse in time rendered the control buy information stale, the court found that observations by the informant the day before the warrant issued were "firsthand and specific" in that the informant reported "observ[ing] firearms and drugs packaged for distribution in Bradford's residence" including identifying "the firearms Bradford possessed by type and location in the residence." *Id.* Swift argues that in his case, the only new information following the controlled buys was neither firsthand nor detailed: the November text about having a lot of "perk-30" pills was not firsthand knowledge because the CS never saw the pills, and the January information about the CS's cousin was unreliable hearsay given that the CS never saw the "stuff" his cousin purchased from Swift nor was his cousin ever identified. The Government disputes this characterization and instead contends the affidavit describes a continuing pattern of criminal conduct from March 2024 through January 2025 at the South Calhoun location, and that "[a]lthough some of the information was circumstantial, when considering the totality of the

circumstances, all the dots between drug trafficking activity and Swift were connected." (ECF No. 59 at 11).

Had TFO Mooney relied solely on the controlled buys of nine months prior in his January search warrant affidavit, that information might be too stale to support an issuance of the warrant. But that is simply not what happened here. In November 2024, the CS relayed to TFO Mooney that Swift had contacted the CS, saying "he had a lot of 'perk-30,' fentanyl pills." (ECF No. 59-2 at 16). On January 15, 2025, the CS informed TFO Mooney that the CS's cousin had "got 'some stuff,' referring to narcotics" at the South Calhoun location a few days prior; the next day, the CS heard from Swift "Old thang back," which the CS further clarified by telling Swift they were "going to let people know Swift had more narcotics on hand." (*Id.*). Two weeks later, TFO Mooney sought, and the Magistrate Judge granted, a search warrant for the South Calhoun address. The Court agrees with the Government that while each piece of information taken on its own might be insufficient, the combination of this information was enough to "freshen" what might otherwise be stale evidence from the controlled buys. *See United States v. Newsom*, 402 F.3d 780, 783 (7th Cir. 2005) (rejecting staleness arguments concerning year-old evidence because the government also had other, more recent, evidence of continuing criminal activity to bolster probable cause and "freshen" the older information); *see also United states v. Griffin*, 2025 WL 1474679, at *6–7 (S.D. Ind. May 22, 2025) (finding 152-day-old evidence of a single criminal activity refreshed where there was more recent evidence of ongoing criminal activity);

Further, the Seventh Circuit has consistently held that if there is evidence of "ongoing, continuous criminal activity, the passage of time becomes less critical." *Edmond v. United States*, 899 F.3d 446, 454 (7th Cir. 2018) (quoting *United States v. Lamon*, 930 F.2d 1183, 1188 (7th Cir. 1991)); *see also United States v. Harris*, 464 F.3d 733, 739 (7th Cir. 2006) ("[T]he passage of time

is less critical when the affidavit refers to facts that indicate ongoing criminal activity." (internal quotations and citation omitted)); *United States v. McNeese*, 901 F.2d 585, 597 (7th Cir. 1990) ("[W]hen a conspiracy to distribute drugs has been ongoing for years, and is clearly an activity of a protracted and continuous nature, the passage of time between the last described act and the application for the warrant diminishes in significance."), *overruled on other grounds, as recognized by United States v. Westmoreland*, 240 F.3d 618 (7th Cir. 2001). Likewise, the Seventh Circuit instructs "that an issuing judge should not withhold a warrant due to the age of the reported information '[i]f other factors indicate that the information is reliable and that the object of the search will still be on the premises.'" *Edmond*, 899 F.3d at 354 (quoting *Lamon*, 930 F.2d at 1188)).

That is precisely what happened here: while the CS did not provide firsthand knowledge of the continued drug activity in January 2025, but instead relayed information about his cousin purchasing drugs from Swift at the South Calhoun location, that information—combined with the previous controlled buys at that same location—is enough to support a fair probability that contraband or evidence of a crime would be found at Vision Baby. *See United States v. Gibson*, 996 F.3d 451, 462 (7th Cir. 2021) ("[P]robable cause for a search warrant need not be tied to any particular person."); *Gates*, 462 U.S. at 238 (requiring "a fair probability that contraband or evidence of a crime will be found *in a particular place*" (emphasis added)). And although the CS's reference to the cousin's statement about buying "some stuff" from Swift might be inadmissible hearsay, it is well established that "probable cause may be founded upon hearsay . . . ." *Franks*, 438 U.S. at 165; *see also United States v. Ventresca*, 380 U.S. 102, 108 (1965) ("[H]earsay may be the basis for issuance of the warrant so long as there is a substantial basis for crediting the hearsay." (internal quotations omitted)). If the CS's referral to the cousin's message about Swift

were the *only* basis relied upon by TFO Mooney in the affidavit, this would be a different story. But here, months of investigation—even with a few lulls—had established not only that the CS was credible and reliable but also that Swift was continuing to engage in drug trafficking activity at Vision Baby. That the CS did not personally observe the drugs in January 2025 matters little when one takes all known facts at that time into account: the CS had heard from Swift that Swift had narcotics available, the CS's cousin had recently purchased drugs from Swift, and that sale had occurred at the South Calhoun location, just as it had months prior. Ultimately, while Swift would have the Court focus on individual trees rather than the forest, it is the forest that matters in a probable cause determination.

Based on these facts, the Court has little trouble concluding that the totality of the circumstances supported the Magistrate Judge's probable cause determination that a reasonable probability existed that evidence of drug trafficking would be found at the South Calhoun location.

### b.  Franks *Hearing Request*

Swift next asserts that TFO Mooney omitted basic information regarding the CS's criminal history as well as the CS's family's criminal history,[4] and that these omissions combined with the insubstantial corroboration of the CS's proffered information about Swift would have been critical to the Magistrate Judge's assessment of the CS's reliability. Because that credibility information was omitted, Swift believes the warrant "was insufficient, unreasonable, and the fruits of its

---

[4] In his Reply, Swift for the first time asserts additional omissions or falsities he believes were included in (or left out of) the affidavit: the CS had a suspended license, the affidavit misidentified the South Calhoun location by simultaneously referring to it as a business and a residence without specifying the residence was separate on the second floor, the affidavit undersold the circumstances of the CS's January arrest, TFO Mooney misidentified the fentanyl as methamphetamine, and it was false to say there were three controlled buys rather than two. (ECF No. 63 at 11–14). Not one of these alleged errors was identified in Swift's original brief, and for that reason alone they could be considered waived. But even if they were not, Swift makes no valid argument as to the materiality of these errors, let alone any reference to the intentionality of TFO Mooney in allegedly making these errors or omissions. His conclusory assertion that these omitted or misstated facts "were certainly material" is certainly unpersuasive. Accordingly, the Court will not address these alleged errors further.

searches, including all subsequent warrants based upon the same information, should be excluded," and he requests "an evidentiary hearing to assess the representations and omissions of the January Warrant Affidavit and upon which the subsequent searches and seizures in this case were based." (ECF No. 57 at 16, 20).

Search warrant affidavits are presumed to be valid. *Franks v. Delaware*, 438 U.S. 154, 171 (1978). That said, a search warrant is invalid if police officers obtain it by deliberately or recklessly providing the issuing court with false, material information. *United States v. McMurtrey*, 704 F.3d 502, 504 (7th Cir. 2013). In *Franks*, the Supreme Court defined the procedure, evidentiary burdens, and proper remedies associated with a defendant's attack on the truthfulness of statements made in an affidavit supporting the issuance of a search warrant. To obtain a *Franks* hearing, the defendant must make a "substantial preliminary showing" of (1) a material falsity or omission that would alter the probable cause determination, and (2) a deliberate or reckless disregard for the truth. *McMurtrey*, 704 F.3d at 508. "These elements are hard to prove, and thus *Franks* hearings are rarely held" because a defendant seeking a *Franks* hearing "bears a substantial burden to demonstrate probable falsity." *United States v. Maro*, 272 F.3d 817, 821 (7th Cir. 2001) (citations omitted). "Conclusory, self-serving statements are not enough to obtain a *Franks* hearing." *United States v. Johnson*, 580 F.3d 666, 671 (7th Cir. 2009) (citing *Franks*, 438 U.S. at 171). Allegations of falsehood or reckless disregard for the truth must be "accompanied by an offer of proof." *Franks*, 438 U.S. at 171.

The Seventh Circuit has interpreted the holding of *Franks* to apply to omissions as well. *United States v. Williams*, 737 F.2d 594, 604 (7th Cir. 1984). Therefore, a defendant may also challenge an affidavit by showing that the affiant intentionally or recklessly omitted material information. *See id.*; *see also Shell v. United States*, 448 F.3d 951, 958 (7th Cir. 2006).

Nevertheless, "[i]f sufficient allegations existed warranting the search irrespective of the affiant's alleged errors, a hearing is unnecessary and the motion should be denied." *United States v. Mullins*, 803 F.3d 858, 862 (7th Cir. 2015). Simply put, a defendant seeking a *Franks* hearing bears a substantial burden, and Swift fails to clear that high hurdle at every single step. There is no question that there were some errors in the affidavit,[5] but the fact of those errors alone is not fatal to the affidavit or else worthy of a *Franks* hearing or suppression of the recovered evidence. *See Ventresca*, 380 U.S. at 108 (explaining that warrant affidavits "are normally drafted by nonlawyers in the midst and haste of a criminal investigation"); *United States v. Briggs*, 2021 WL 915940, at *20 (E.D. Pa. Mar. 10, 2021) ("But shoddy and sloppy is not [a] threshold requirement necessary to trigger a *Franks* hearing."). And as the Government is quick to point out, Swift's "offer of proof" amounts to no more than conclusory statements that certain information was omitted: the CS was arrested for possession of marijuana during the investigation,[6] the CS "may also have a conviction for visiting a common nuisance,"[7] that the CS's family has a history of drug-related crimes or that a cousin—not even necessarily the cousin who allegedly bought "some stuff" from Swift, merely *a* cousin—has been convicted of those drug crimes. Swift makes no argument, let alone a

---

[5] For example, the affidavit first reports the FWPD "conducted three controlled buys of methamphetamine from Benny Swift," (ECF No. 59-2 at 9), but otherwise describes transactions as controlled buys of fentanyl pills. Similarly, the affidavit incorrectly refers to Swift's business as "Baby Vision" rather than "Vision Baby." (*Id.* at 11). Additionally, Swift points out some repeated paragraphs and confusing times for the November 21, 2024 surveillance. (*Id.* at 16). Though the Court acknowledges these errors among others, it fails to see how any of these errors could be material.

[6] This information was, in fact, included in the affidavit. *See* ECF No. 59-2 at 17 ("On January 8, 2025, the Fort Wayne Police Department arrested the CS for possession of marijuana and for a failure to appear for a traffic violation.").

[7] While Swift's Reply more definitively asserts that the CS did have a prior conviction, the inconclusive language Swift originally uses—that the CS "*may also have* a conviction"—does not help the required *Franks* element (which Swift does not acknowledge) that TFO Mooney knew about and intentionally omitted that information from the affidavit.

15

persuasive *legal* argument, why any of those alleged omissions would be material or would counteract the CS's other sources of credibility (as discussed above).[8]

Moreover, it is well established that "magistrate judges . . . often know, even without an explicit discussion of criminal history, that many confidential informants 'suffer from generally unsavory character' and may only be assisting police to avoid prosecution for their own crimes." *United States v. Veloz*, 948 F.3d 418, 428 (1st Cir. 2020) (quoting *United States v. Avery*, 295 F.3d 1158, 1168 (10th Cir. 2002)). The affidavit explicitly mentioned that the CS "agreed to work with the FWPD in providing information and conducting controlled buys of narcotics from Swift *in order to gain consideration for potential charges*." (ECF No. 59-2 at 11) (emphasis added). The affidavit further mentions the CS was arrested for *unrelated* criminal drug activity during the investigation. *See id.* at 17. It takes no great leap of imagination to infer that the CS had a criminal history (and a drug-related one at that) meaning that any alleged "omission" of the specifics of that history would likely not have swayed the Magistrate Judge on the CS's credibility, TFO Mooney's veracity, or the ultimate question of probable cause.

Of equal importance, there is not even the slightest allegation or offer of proof that TFO Mooney was aware of Swift's alleged family history of criminality and the other facts mentioned, or that despite being aware, he omitted them from the affidavit intentionally or recklessly. In the same vein, Swift has not even *hinted* at any evidence, either direct or circumstantial, of the affiant's state of mind regarding the allegedly omitted information. *See United States v. Daniels*, 906 F.3d 673, 677 (7th Cir. 2018) ("To secure a *Franks* hearing, a defendant must put forth 'an offer of

---

[8] On the topic of the CS's criminal history, there is a fair argument to be made that they were not omissions at all but merely a lack of specificity. *See United States v. Colkley*, 899 F.2d 297, 300 (4th Cir. 1990) ("An affiant cannot be expected to include in an affidavit every piece of information gathered in the course of an investigation."). But even if they could be characterized as omissions, the Court fails to see how more detail into the CS's criminal past—be it his suspended license or his alleged visitation to a common nuisance—would be crucial to the magistrate's probable cause determination.

proof' that is 'more than conclusory' and gestures toward more than negligent mistakes."); *United States v. Glover*, 755 F.3d 811, 820 (7th Cir. 2014) (requiring "direct evidence of the affiant's state of mind" or else "circumstantial evidence of a subjective intent to deceive"); *United States v. Larry*, No. 1:17-cr-40, 2021 WL 38006, at *3 (N.D. Ind. Jan. 5, 2021) ("An omission without a corresponding assertion of intentionality, recklessness, or a demonstration of materiality does not create a basis for a *Franks* hearing.").

Any one of these failures would keep the Court from authorizing a *Franks* hearing. Combined, his request is doomed. Accordingly, Swift's motion for a *Franks* hearing is DENIED.

## II.    January Search Warrant Scope and Execution

Swift also challenges the scope and execution of the January search warrant. He first contends that the warrant lacked specificity in the place to be searched by confusing the nature of the building: the warrant describes the premises as both a "business" and a "residence," while Swift believes it to be a multi-unit building with a separate entrance for the upstairs apartment. Citing cases in which search warrants for multi-unit buildings had to specify the unit subject to the search with particularity, Swift further claims that any probable cause determination should have been limited to the business where the controlled buys had taken place. But officers extended the search beyond the first-floor storefront without first seeking a warrant for, in Swift's eyes, the clearly separate apartment unit, and, notably, the *only* evidence uncovered in the search of the business was a single firearm. All other evidence—firearms, drugs, paraphernalia, papers—was seized from the upstairs apartment.

The Government argues to the contrary, asserting that Swift makes no reasonable argument that the multi-unit caselaw should come into play here where there is no allegation or physical indication that the South Calhoun location was occupied by anyone other than Swift. Further, the

Government notes that to the extent the affidavit described the premises as both "business" and "residence," if that was an error it would not render an otherwise valid warrant defective. And finally, even if the location *did* have multiple units, the warrant was still valid because at the time of the warrant's issuance, after officers had conducted "extensive surveillance of the premises over 10 months," there was no indication that the building contained multiple units. (ECF No. 59 at 22–23).

The warrant in this case authorized the FWPD to search the premises of the South Calhoun address, listing the building has having "a black and white in color business front and a light-colored side on the south side of the structure." (ECF No. 59-2 at 2). The warrant describes the store front and further notes that "[t]he business is on the west side of Calhoun" and "[t]he residence is believed to be controlled by Benny Swift," authorizing the officers to search "all structures and vehicles located on th[e] property or within the residence's curtilage." (*Id.*). Additionally, the warrant specifically identified the evidence to be found in the residence with particularity, as the Court set forth above. *See supra* at 5.

For a warrant to pass constitutional muster, it must be based on probable cause and supported by oath, and it must "particularly describ[e] the place to be searched, and the persons or things to be seized." U.S. Const. amend. IV. This particularity requirement limits "the authorization to search to the specific areas and things for which there is probable cause to search," and in doing so "ensures that the search will be carefully tailored to its justifications, and will not take on the character of the wide-ranging exploratory searches the Framers intended to prohibit." *Maryland v. Garrison*, 480 U.S. 79, 84 (1987); *see also United States v. Jones*, 54 F.3d 1285, 1289-90 (7th Cir. 1995). This requirement is satisfied if "the description is such that the officer with a search warrant can with reasonable effort ascertain and identify the place

intended." *United States v. McMillian*, 786 F.3d 630, 639 (7th Cir. 2015) (quoting *Steele v. United States*, 267 U.S. 498, 503 (1925)).

That said, a valid search warrant might include "minor technical errors or omissions . . . so long as there is no danger that the officers might inadvertently search the wrong place." *Id.* at 640; *see, e.g.*, *United States v. Kelly*, 772 F.3d 1072, 1081-83 (7th Cir. 2014). In assessing a warrant's validity, the court considers "whether the warrant and affidavit provided a detailed description of the premises and whether the officers executing the warrant knew the correct target location or could have searched the wrong residence." *McMillian*, 786 F.3d at 640. The law recognizes "the need to allow some latitude for honest mistakes that are made by officers in the dangerous and difficult process of making arrests and executing search warrants." *Garrison*, 480 U.S. at 87. Still, the Fourth Amendment "categorically prohibits," a warrant that fails to describe the place to be searched with particularity. *Id.* at 84. But at the end of the day, a warrant's validity is assessed based on the "information available to [the officers] at the time they acted" and the "information that the officers disclosed, or had a duty to discover and to disclose, to the issuing [magistrate judge]." *Id.* at 85; *see also United States v. Hinton*, 219 F.2d 324, 326 (7th Cir. 1955) ("[V]alidity of the warrant is dependent on the facts shown in the affidavit before the issuing authority").

Swift advocates that the warrant was invalid because it did not accurately describe the nature of the building, referring to the South Calhoun location as both a "business" and a "residence" while never mentioning the upstairs apartment.[9] But although the warrant was not

---

[9] To be more accurate, Swift argues—without any supporting evidence—that "TFO Mooney failed to inform the Magistrate that the building contained a separate finished upstairs apartment unit." (ECF No. 63 at 15). As with his other *Franks* assertions, this argument fails to include anything more than conclusory allegations which the Court will not further entertain.

necessarily the most clear about the distinction—perhaps because, as the government alleges, the officers did not and could not know the internal layout of the building without entering themselves—the warrant nevertheless accurately and particularly describes the multi-purpose nature of the building and that Swift had access to and control over the entire premises. That the officers discovered that the interior of the business included stairs leading to a residential space, also allegedly controlled by Swift, upon the execution of the warrant matters little to whether the warrant was properly issued. *See Garrison*, 480 U.S. at 85 (emphasizing that the finding of a warrant's validity depended on the information available to the officers at the time they applied for the warrant, and that "[t]hose items of evidence that emerge after the warrant is issued have no bearing on whether or not a warrant was validly issued"); *see also Kelly*, 772 F.3d at 1082 ("The fact that the building's layout differed from what the officers were able to discern without having been inside is insufficient to render the warrant invalid."); *United States v. McNeeley*, 641 F. Supp. 3d 497, 508 (N.D. Ind. 2022) ("The outside of the building may have suggested a commercial use in part; but the interior layout of the building was not evident when officers had not been inside.").

While Swift nominally attempts to analogize the apartment space here to cases holding that a warrant is void where it permits a search of an entire building when cause is shown for searching only one apartment, those cases are inapposite. It is true that "[a] warrant authorizing the search of an entire multi-unit building is fatally defective 'when the warrant authorizes the search of an entire structure and the officers do not know which unit contains the evidence of illegal conduct.'" *Jacobs v. City of Chicago*, 215 F.3d 758, 767 (7th Cir. 2000) (quoting *United States v. Johnson*, 26 F.3d 669, 694 (7th Cir. 1994)). But there are exceptions to that general rule when "(1) the officer knows there are multiple units and believes there is probable cause to search each unit, or (2) the targets of the investigation have access to the entire structure." *Johnson*, 26 F.3d at 694. Here,

20

there is nothing to indicate the apartment unit is somehow "separate" from the business beyond stairs—located inside the business—and perhaps a door. *Compare Guzman v. City of Chicago*, 565 F.3d 393, 398 (7th Cir. 2009) (finding search unconstitutional where the warrant was for a single-family residence, but a search of the building revealed multiple multi-purpose units that were clearly separate and had no internal access to other units) *with United States v. White*, 416 F.3d 634, 639 (7th Cir. 2005) (upholding warrant where investigation suggested a house was a single-family residence and a search revealed both business and residential units, but where the "house d[id] not have the typical distinctions that designate separate apartments" such as "a storefront barbershop with clearly marked apartments next to or above the store"). And even if one could describe the business and residential units as "separate," that would still not overcome the fact that officers were under the impression (correctly) that Swift—the target of the investigation— had access to the entire structure, making the multi-unit cases inapplicable. *See Johnson*, 26 F.3d at 694; *see also United States v. Gilman*, 684 F.2d 616, 618 (9th Cir. 1982) ("The general rule voiding the warrant for an undisclosed multiunit structure does not apply if the defendant was in control of the whole premises or they were occupied in common, if the entire premises were suspect, or if the multiunit character of the premises was not known to the officers.")

While in a perfect world the warrant application might have more specifically included that the "residence" portion was an upstairs apartment unit controlled by Swift, adding that detail would have made the warrant more descriptive "but not more particular in avoiding any risk of Fourth Amendment concern." *McNeeley*, 641 F. Supp. 3d at 510. As such, the Court finds the warrant was sufficiently particular within the Fourth Amendment's meaning. *See White*, 416 F.3d at 640 ("Viewed in full, even if the house did contain multiple units, the warrant was sufficient at the time of issue. As in *Garrison*, the police conducted a reasonable investigation, which did not suggest

that the . . . house actually contained more than one unit. . . . And when the CI entered, he encountered White who obviously had control of the house as he executed the drug sale. On the information that the police knew or should have known, the warrant was valid when it issued.").

Although the Court concludes the warrant was valid based on the information available to the officers at the time of its issuance, it nevertheless must address the independent inquiry of whether the warrant was properly executed. *See Garrison*, 480 U.S. at 84 ("[T]he case presents two separate constitutional issues, one concerning the validity of the warrant and the other concerning the reasonableness of the manner in which it was executed.").

Without citation to legal authority, Swift asserts that law enforcement officers should have stopped at the door leading to the apartment and sought a second warrant. But as discussed above, the warrant authorized the search of "all structures and vehicles located on this property or within the residence's curtilage." (ECF No. 59-2 at 2). With no description of the apartment door in the record, there is nothing to indicate that the officers would have known it was anything other than a continuation of the business space, and it is well established that "[a] lawful search of fixed premises generally extends to the entire area in which the object of the search may be found and is not limited by the possibility that separate acts of entry or opening may be required to complete the search." *United States v. Ross*, 456 U.S. 798, 820 (1982). In somewhat similar circumstances, the Seventh Circuit has rejected the notion that officers need to stop their search and seek a second warrant if they find the layout of the premises different than described in the warrant but nevertheless were still searching the original targeted location. *See Kelly*, 772 F.3d at 1083 (finding officers were not constitutionally required to seek a modified warrant upon discovering the layout of the building was not as described in the warrant but where "[t]he officers limited their search to the targeted apartment and, because only one apartment was accessible from the door through

which they entered the building, there was no risk that they might inadvertently have searched the wrong unit").

Swift has cited to no authorities supporting his position that the warrant to search the South Calhoun location would not extend to the entire building and include all rooms where the items contained in the warrant might be found. Rather, Swift simply argues that the officers mistook the layout of the building and the warrant did not specifically list the upstairs residential space. This argument is not persuasive given *Ross* and *Kelly*. Accordingly, Swift's assertion that the search of the upstairs apartment violated the Fourth Amendment is without merit.[10]

## CONCLUSION

Based on the reasoning above, Swift's Motion to Suppress and corresponding request for a *Franks* hearing (ECF No. 56) are DENIED.

SO ORDERED on February 9, 2026.

s/ Holly A. Brady
CHIEF JUDGE HOLLY A. BRADY
UNITED STATES DISTRICT COURT

---

[10] Because the Court finds probable cause existed for issuance of the January Search Warrant, Swift failed to meet his burden for requesting a *Franks* hearing, the search warrant was sufficiently particular and its execution did not run afoul of the Fourth Amendment, the Court need not address the alternative argument that the officers' good-faith reliance on the warrant validates the search.

As to the subsequent search warrants, Swift makes no substantive argument for the suppression of the fruits of those searches. To the extent his claim is that the other warrants rise and fall with the outcome of the January warrant, that argument fails given the outcome here.